Army Corps of Engineers Mr. Stansky, you've set aside five minutes of your time for rebuttal, correct? That's correct, Your Honor. All right, you may proceed, sir. Your Honor, I want to... Good morning, first of all. May it please the Court. This is a mistaken bid case, but I want you to view it through the context of the times that this happened. This is in a new theater of war in Afghanistan in 2004, just as the insurgency was beginning. So I'm explaining that because not only did the court itself state in the record, they were setting up a new office. They were first composing, getting the material, the men. That is one of the reasons the solicitation package was so, I use a polite term, haphazard. It was not as complete, as thorough as what we're typically used to in a Corps of Engineers solicitation. And frankly, it was not even as good as another more recent procurement at the court itself. How does that go to your own failure to not inspect the site? Okay, so that assumes that there was a site inspection. I've devoted a great deal of material to the fact that in the thousands of documents furnished in the appellant through discovery, not one shred of documentary evidence shows that there was a site visit. So what we have is a brief glimpse of testimony by one person who said... You're saying that the government did not inspect the site before they issued the solicitation? The government did. I thought your question was why the appellant didn't. Did you request to make a site visit? No, we did not because it was not mandated in the solicitation itself. Whereas the most prior solicitation right next door did require a site visit. But be that as it may, by the way, also the testimony in the board decision itself says... Why didn't you ask for an inspection? We realize there wasn't a scheduled inspection. But you could have undertaken an inspection anyway. Judge, these are haphazard times. It wasn't a routine situation where you can devote all your resources and manpower. It was one of those things they just did not request in the site inspection, primarily because... I'm sorry, a site visit to see how many stories there are does not require a lot of manpower. And you were about to, as soon as you got the contract, it's not like this was a war zone and you weren't going to go there. The contract was going to require you to go there. So you send one person from Turkey, is that where your company is? Yes. Yeah, from Turkey to go and count the stories. I hear from the question, I don't have the answer of why, except what the evidence indicates. But having said that, let's say they did not consciously request an access to a site visit. That doesn't take away from the requirements necessary to prove a mistaken bid. They were... The government's independent government estimate was $16 million and change and $12 for the options of a total of $29 million. My client's bid was $10 million compared to the government of $17 million and $6 million for the option for a total of $16.9 million. So we're 43% below the IGE. We're 28% low. The next low is bidder, which the government mistakenly thought was a contractor located in the United States. Whereas in reality, it was one block away from my client's offices in Ankara, Turkey. I thought the government contractor thought that KCC... I don't think it thought that KCC was in the U.S., but it was using a design firm in the U.S. No. If you look at the appendix and the citations in the brief, it did both. In one portion, it said, we think Centrax is located in Louisville. But then somehow through that evaluation process, they then concluded, and Mr. Mullery, I cite his testimony, he said, we, the government, in evaluating these bids, we thought Colin was a United States contractor. And therefore, that's why that accounted for their higher pricing theoretically, because theoretically a higher overhead. Another very important thing is we notify the government 10 days after the notice to proceed. And we received instead conflicting positions from the government saying there was a site visit. You were given the sketches. There was a site visit on a different day in which you were offered the opportunity, but there were no sketches. There were diagrams, and then all going to the issue of whether takeoffs could be taken, whether the contract could rely on the data in the record. If this had been evaluated conscientiously by the government 10 days after the situation arose, we would be talking about a case of rescission, not reformation, which is a higher burden to read. I want to go to the, to me, what seems to be the core issue of what the board relied on. Yes, in one instance it says we didn't do the site visit. But I said, having said that, we still fit within the confines of a mistaken bid. And the problem is that what is a judgment? The board seems to think this is a mistaken judgment. To me, a mistaken judgment is the contractor and the government looks at a 10-story building. And the contractor says, I think I can do that for $8 million based on some assessment I'm making on the marketplace. The government says, no, you could do that for either $4 million or you could do it for $16 million. We're talking about afterwards. In our situation, the record reveals that in the Michael Baker estimate, which the government had and could have looked at as soon as 10 days after the allegation of a mistaken bid arose, one building alone, the Polytechnic Clinic, there was a $2.5 million difference in the government's estimate for that one item amongst the many buildings. And in addition, the Michael Baker report showed that the square meters were totally in different ballparks. There was a difference of 3,000 square meters. Can I interrupt you for a minute? I want to just go back to the site visit. Now, I thought that other potential bidders had attended a site visit. The record doesn't reflect that at all. That's in the board's opinion at JA, I think it's 39 and 49. That's what the board says. The board says, but what is it based on? Not one piece of documentary evidence, not an invitation to any lawful war. So there was government testimony to that. That's right. There's nothing in there. They located, after the depositions were done, they all of a sudden located a witness who heard there was a hearing coming up on Zephyr. And he remembered that he had attended a site visit. As a practical matter, when there are other potential bidders who attend a site visit, what usually happens in that circumstance? Does the government say, hey, potential bidder, somebody else is going to attend a site visit. You're welcome to come. Or is it just something where some parties request a site visit and some potential bidders do not? No. Your Honor, my experience for 45 years, typically the government, when it wants a site visit and it's important to the government as well. Setting aside whether it's important to the government, whether a potential bidder says, you know what, this is a big contract. I want to look at the site. In that kind of circumstance where the government has not scheduled a site visit, what happens in that circumstance? A contractor can request, if circumstances permit, if the security conditions warrant, if the government has the manpower to conduct a site visit, whether the facility is operational and can host a site visit. A variety of different factors go into the government's decision then to acquiesce and say yes to a contract. Okay, we will conduct a site visit. So it's theoretically possible. But I think in the circumstances here, there's absolutely no credible evidence that a site visit ever occurred. And I'm stating to the Court— But is that really the issue? I mean, is it the issue that you could have requested a site visit, but you didn't? And there were the Army specifications, the Russian drawings that were available. And you didn't look at those until after you submitted a bid. Not quite accurate, Your Honor. Then after you did the bid, then you did have a site visit. And it was at that site visit that you discovered that there's all these basements on these buildings and there's an additional playground. And that's when you realized you had seriously—you had a problem. Let me correct what you said. You said the contract did not look at the specifications. It did. It looked at two sets of information. These sketchings, sketches that we're talking about, were also referred to as drawings. And it also looked to the written specifications that in certain instances said, building number X has three stories. Did you look at the Russian drawings? We did not, Your Honor. We did not. You did not. We did not. Because, just as the board said, they were not translated. They were not certified. We couldn't— They're drawings. The contract— What do you—you translate a drawing from Russian to English? The contractor viewed that—the purpose of those being provided so that he could—the contractor could provide the as-builts at the conclusion of the contract. It didn't rely on the accuracy or validity of those drawings since the government wouldn't certify them. So they were available, but we're not getting to as representative of what the actual conditions are of these buildings. That's all I have at this time. Okay. Thank you, sir. Counselor Long? Thank you, Your Honor. May it please the court, just to touch on a few points that the court raised with Mr. Gudansky. As you noted, there was indeed a site visit, and I think that the board made lengthy findings as to it. There were, to be sure— and not supported by any documentary evidence. That's correct, Your Honor. It was largely based on witnesses' testimony, but the board— Largely? It was—I'm sorry. Yes, sir. It was totally based on witnesses' testimony. But it was two witnesses, actually, and the board made lengthy findings, which, as Judge Stoll noted, is at Appendix 49, describing what they recollected. But ultimately, as I think the court understands, that doesn't matter. There's an affirmative obligation by the contractor to satisfy itself as to site conditions. It could have requested a site visit. It did not. Even if there was— So what's the procedure there? The company writes a letter to the contracting officer and says, We'd like to visit the site on so-and-so date. Is it a formal schedule that's made? I don't know, Your Honor. I don't know the answer to that. I would imagine it to be relatively informal, given the circumstances. I know that Zoffer had individuals in Kabul at the time working on a separate contract, as I understand it from the record. So I don't see why it couldn't be less formal than that. To what extent did the solicitation reveal that all these buildings had—or some of them, anyway—had basements, and then there was also the additional ground compound or area? I think the solicitation does reveal basements in some buildings. I don't think that the solicitation gives a full view of every building. Did the Russian drawings reveal that? That was the board's finding, Your Honor. The board concluded that, based on the Russian drawings, a bidder could understand the number of floors on each building and the nature of the buildings. And, as the court noted, Zoffer never asked to see those drawings, despite them being the original performance criteria called for in the solicitation. I'll note, I don't know that this is— well, the contracting officer did find in her evaluation of the bids that KCC's subcontractor was located in the United States, and that's at appendix page 59. Again, though, the board gave Zoffer the benefit of the assumption as to McClure elements numbers three and four, which include the contracting officer's understanding of the bids and whether there should have been a request for verification. The board's focus, as I'm sure you all know, is on whether there was a mistake in this reading of specifications and what Zoffer's intended bid was. And that's where Zoffer's claim failed. And finally, I'll just note, this isn't really a mis— well, Mr. Ganansky focused on whether there was a mistake in judgment here. The choice not to inquire is not a mistake in judgment. It's not a misreading of the specifications, which is what they've relied on for purposes of the unilateral mistake argument. It is rather, as we say in our briefs, a mistake in business judgment in choosing not to adequately investigate the scope of the work required. Is there no more questions? Nope, doesn't look like it. Thank you. Thank you, Your Honor. Mr. Ganansky, you have five minutes left of your time. Yeah, I just have three points, Your Honors. Yes, there was an indication that they thought the subcontract, but also, just more importantly, and I quote from page six of my brief, they concluded that Colon is headquartered in the United States. It wasn't just that the subcontractor, a design subcontractor. They actually thought Colon was in the United States. On the issue of the site visit, even the board's decision, I believe, when we look at the actual quote that's quoted in the government's brief, not all the buildings were explored. And I believe, factually, the Polytechnic Clinic, which is the bulk of our claim, or more than half of our claim, was not a building that was actually visually inspected by the site team, so they wouldn't have seen that. It was a campus ground, so it was not just a central one building location, so that wouldn't have been apparent. The other thing is, the Michael Baker team that did the assessment to come up with a government estimate, they, in their report, used the concept of one, three, eight, that the specifications and the sketches either showed a building that was one story, three stories, or eight stories. And that's exactly what Zafra did in pricing the bid. Looked at what the sketches were, what the site plan drawings were, and what the specifications said, and where all those three indices said, a one story building, that's what Zafra relied on. So, I know it weighs heavily on you they did not conduct the site visit, but I have to echo the point that regardless, let's say they didn't do the site visit. There's still a mistake. And the kind of mistaken judgment that the appellate court decisions deal with when they say, we're not going to honor a mistaken judgment because we chose to do it, is not a question of what they're relying on in putting a bid together. It's in the Hamilton case that is one of the biggest precedents in the court, a contractor had a mess of tenant services, and he thought he could do the job with the manpower he had. So, that was the mistaken judgment that the court would not grant relief for, although it found all the other criteria satisfied. So, even if there was no site visit, and my client didn't ask for one, and he judiciously relied on the best available information given to him in contractual documents, he still meets all the criteria of a mistaken bid. Because what does it come down to? Essentially, he thought that one building had one story. So, he was wrong. That's why it's called a mistaken bid. But it does satisfy all the other criteria. The verification request was sent to him after the government rejected its bid. Let's not lose sight of that. And then they asked him to verify. There was no indication that they suspected a mistaken bid, no indication that there was anything wrong with the pricing, but he took that to mean, is your bid still valid? Are you saying that in this contract area, there really isn't another case involving the mistake doctrine that's at issue here, where the mistake was a bad decision not to seek information that was there for the seeking? If you want to characterize it that way, I'll take that characterization. It's a slightly generalization of this. Hamilton and other progeny at this circuit, the only time they rejected a mistake, I don't want to say it that way, they have rejected a mistaken bid claim, although all the other elements have been found. You can show that you're not higher than the next lowest bidder. By the way, just to mention passing, our REA that went in was before we received the discovery. We didn't know what the next highest bid was. Just to show our good faith, we didn't gauge the system and find out the next lowest bid was $5 million, so now we're putting in an REA for $4.5 million. We submitted what were based on a third-party analysis of what the price should have been. But getting back to your question, I do not believe, as a matter of fact, if you go to my first of my brief in the reply brief when we discussed that issue, what the circuit has found, they did not do it as saying, you handled this bid in a sloppy fashion. You chose not to do the following when you could have ascertained exactly your example here. It's only been when they've, the leap hair crane case, that's the other case, same kind of thing. The contractor put all the elements of the mistaken bid, but he made what his error in judgment was. He thought they had a crane in their inventory that they could modify that would carry the load that was necessary. That was, and the argument there was based on failure to read the whole specification and recognize the requirements there. Is that right? Yes, the load capacity, they thought their unit could do it. We never thought we could build a five-story building for the price we submitted. Well, I'm talking about the leap hair case. Yes, but that goes to the core of what is a mistaken judgment in the context of a mistaken bid. And I think the facts here that we still have a valid mistaken bid. I don't want to say we screwed up. We did not have a site visit. So we relied on the fact that the specs and the drawings and the sketches showed 138, which is what Mr. Petrarca from Michael Baker said. That was the concept governing everything. The parallel procurement that happened six months earlier next door for an ANA Army facility had absolutely no problems. It had photographs in that. It had a mandatory site visit in there. So this error that occurred was not one-sided. I mean, the government conceded. It just didn't have the wherewithal to put together a tight solicitation package. Would you like to conclude, sir? Yes, that's it. Thank you.